# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| SECURADYNE SYSTEMS, LLC, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:13-cv-387-DBH |
| | ) | |
| PETER GREEN, ET AL., | ) | |
| | ) | |
| DEFENDANTS | ) | |

## DECISION AND ORDER ON MOTION FOR INJUNCTION

This case was tried before me without a jury on March 24 and 25, 2014, on the issue whether the plaintiff Securadyne Systems, LLC ("Securadyne") is entitled to a permanent injunction against the defendants Minuteman Security Technologies, Inc. ("Minuteman"), Jon Morton, Josh Scholl, and Angela Wilder under the Standards of Conduct Agreement ("SOCA") that the three individual defendants signed while Securadyne employees (they now work for Minuteman); or, conversely, whether these defendants are entitled to a declaratory judgment that they have no liability under the agreement because it is unenforceable.[1] I issue these findings of fact and conclusions of law under Fed. R. Civ. P. 52, and **GRANT IN PART** the plaintiff's motion and **DENY** the defendants motion.

---

[1] Although the motion was originally for a preliminary injunction, by agreement of the parties the matter was consolidated for a hearing on the merits on the request for a permanent injunction. Report of Hearing and Order Re: Scheduling (ECF No. 47). Peter Green, formerly Securadyne's Maine Branch Manager, is also a defendant, but Securadyne is not seeking this injunctive relief against him and Green is not seeking declaratory judgment on enforceability of the pertinent SOCA provision.

**FINDINGS OF FACT**[2]

1.     Securadyne and Minuteman are security solutions integrators and providers to large enterprises (*e.g.*, hospitals, colleges and industrial establishments).  They compete with each other for business.

2.     Morton, Scholl and Wilder worked for Surveillance Specialties Ltd. ("SURV") from approximately 2008 until Securadyne acquired SURV in 2012.

3.     Effective August 31, 2012, Securadyne acquired SURV in a stock purchase transaction, and Morton, Scholl and Wilder became Securadyne employees with the same pay and benefits as they received previously at SURV.

4.     On September 19, 2013, Minuteman offered employment separately to each of Morton, Scholl and Wilder.

5.     Morton and Scholl gave Securadyne their notices of resignation on September 19, 2013.

6.     Wilder gave her notice on September 20, 2013.

7.     Morton, Scholl and Wilder all began working for Minuteman on October 4, 2012.

8.     At the time Securadyne acquired SURV in 2012 and for much of 2013, Minuteman had no physical presence in Maine. Securadyne, on the other hand, then had approximately 16 employees in Maine.

9.     Minuteman interviewed all three individual defendants in Portland, Maine on September 19, 2012, in a rented conference room.  At the time, Minuteman did not have a built-out office in Maine, and these three became its

---

[2] The first seven are, for the most part, Stipulated Facts.

first Maine employees.  Shortly before that date, Minuteman interviewed the defendant Peter Green, Securadyne's Maine branch manager, but did not offer him employment.  Minuteman also hired a fourth Securadyne employee at about the same time.

10.  Morton and Scholl both had worked for other employers in the security integrator industry before they worked for SURV/Securadyne.  They had acquired skills and earned certificates in that prior employment, had developed relationships with customers and contacts there, and had gained familiarity with those customers' security needs and installations.  Before her work for SURV/Securadyne, Wilder had worked for only a short time in the security integrator industry as a temporary employee at a company that SURV acquired.  Some of the Customers that Morton and Scholl serviced previously at other employers eventually became customers of SURV/Securadyne.

11.  At Securadyne, Morton and Scholl both were senior technicians with a number of responsibilities in technical matters and sales support.  Scholl was also a Project Manager.  They delivered services to customers, met regularly with customers and were integral to customer relations.  Morton had special expertise in video and Scholl in access control.  Both assisted salespeople in the sales process by providing technical detail and help to prepare quotes.  At Securadyne, Wilder was an operations and office manager and dispatched technicians and received phoned customer requests for service.  She acted as the office point person for customers, taking service inquiries and

problems and dispatching technicians. She spoke with every customer in Maine who had a service issue.

12. While at Securadyne, Morton and Scholl had material contacts with the customers who are listed by name on Exhibit 27. Wilder had contact with all customers, including these.

13. All three individuals were employees at will at Securadyne.

14. After Morton, Scholl and Wilder left Securadyne to work for Minuteman, a number of Securadyne's customers also left, some of them becoming Minuteman customers. Minuteman also has customers that were not previously Securadyne customers.

15. At Minuteman, some of Scholl's responsibilities are to visit customer sites, perform installations, service the access control systems, and maintain the security features of the customers—duties that he also performed at Securadyne. At Minuteman, he provides security services to entities that previously were Securadyne customers and that he serviced as a Securadyne employee, dealing with the same personal contacts at those customers. Scholl is almost always in the field with customers for Minuteman. At Minuteman, Morton visits customer sites, installs and services video and surveillance equipment, services access control systems and provides generalized sales support—duties that he also performed at Securadyne. Wilder has the Office Operations Manager position at Minuteman and performs essentially the same services that she performed at Securadyne, dealing with all phoned customer requests for service and dispatching technicians.

16. In recent years, Morton, Scholl and Wilder received bonuses from SURV/Securadyne. Morton received $2000, $625, and $2500 in 2011, 2012, and 2013 respectively; Scholl $2000, $2000, $625 and $2500 in 2010, 2011, 2012, and 2013 respectively; Wilder $2000; $1250, $3000 and $1500 in 2010, 2011, 2012 and 2013 respectively. Their annual wages apart from bonuses were respectively about $100,000, $65,000 and $50,000 per year. The decision to award bonuses and the bonus amount rested entirely in the discretion of SURV's owner and President, Arthur Bourque, while he owned the company.[3]

17. Securadyne adopted a Standards of Conduct Agreement ("SOCA") in 2011 or early 2012 before it acquired SURV. Its President, Carey Boethel, a nonlawyer, drafted the SOCA by cutting and pasting from other agreements he had seen.

18. Justin Davis, who became Securadyne's Regional Vice President, and Peter Green, who became Securadyne's Maine branch manager, each signed the SOCA when Securadyne acquired SURV in the fall of 2012. Other employees were not then asked to sign the SOCA.

19. On Friday morning, February 8, 2013, RVP Davis sent an email to all New England Securadyne employees (Maine and Massachusetts) who previously worked for SURV telling them that they were required to sign SOCAs. The email stated: "We have pre-printed 2 copies of the document (see

---

[3] That was Bourque's testimony. The defendant Green testified that he, Green, as Maine branch manager, set the bonus amounts for Maine employees and that Bourque changed them only to increase them, not decrease them. Justin Davis, who became Regional Vice President, testified that Bourque was the ultimate decisionmaker and changed the Maine bonus suggestions by Green on at least one occasion. I credit Bourque's testimony on the issue of bonuses.

Casey W.⁴) with your name on it. Please sign <u>both</u> copies, keep one copy for yourself and leave the other one with Casey W." Ex. 14. The email went on to say that "everyone needs to have signed and returned their form" by "a week from today Friday, 2/15/13." <u>Id</u>. It also said: "If you know that you won't be in the office before then, you can print the attached, sign it, scan it and email it back to Casey W., or have a co-worker bring it to the office." <u>Id</u>. The testimony is conflicting over whether the SOCA was actually attached to the email or distributed to Morton, Scholl and Wilder for the first time on Monday, February 11, 2013. That dispute does not affect my ruling.

20.    Davis's email also said: "It behooves all of us to get the forms signed as soon as possible as once I have them all in hand I will be in a position to fund and distribute the FY12 bonus monies." <u>Id</u>.

21.    Davis's email gave the following characterizations of the SOCA:

> To be clear, it is NOT a non-compete, meaning it does not restrict anyone's right to work. It does however outline the business practices (100% ethical) that we expect from you during your term of employment and post. The language in the SOCA is almost identical to the '<u>Employee Non-Disclosure, Non-Solicitation & Inventions Agreement</u>' that all of you have signed as a member of SURV (if you worked here prior to the acquisition). The SOCA is the updated version of the document and covers the same topics.

<u>Id</u>.

---

⁴ Casey Walsh was a Securadyne administrator who worked in the same office in Massachusetts as Davis.

22.     Before the Securadyne purchase, Morton and Scholl, but not Wilder, had signed SURV Nondisclosure, Non-Solicitation & Inventions Agreements as SURV employees.  Exs. 37, 47.

23.     Signing the SOCA that Securadyne distributed in February 2013 was a condition of continued employment with Securadyne.

24.     Maine Branch Manager Peter Green called a meeting for Monday morning, February 11, 2013.  Morton and Wilder, but not Scholl, were present at the meeting, as were others.  Green distributed two printed copies of the SOCA to each attendee with their respective names on the agreement, told them the documents could not leave the room until they were signed, and that employees were required to sign them.

25.     When Scholl came to the office later that Monday, Wilder presented the SOCA to Scholl telling him that he had to sign it.  Scholl refused to sign it and went into Green's office and expressed his vehement unhappiness.  Although Scholl refused to sign his name, he did sign his initials,[5] and gave no other indication that he was not agreeing to the SOCA then or later.

26.     All three individuals testified that they felt under duress to sign the SOCA.  There is no evidence that any of the three complained about the SOCA thereafter.  I find that they signed because signing it was a requirement for retaining employment.[6]  I also find that interpreting Davis's email to mean that

---

[5] Scholl testified that he thought other employees' bonuses depended on his signing it, but not because of anything Green said, only by reason of the contents of the email.

[6] The role of the potential delay in individual bonus payments pales in comparison to the amounts these individuals stood to lose in annual earnings if they lost their jobs.

all employees in the company would lose their bonuses if a single employee refused to sign a SOCA is an unreasonable interpretation of what the email said, although it could well herald delay in the processing of bonus payments while the SOCAs were either signed and collected or an employee surrendered employment.

27.     The SOCA's pertinent language, the enforceability of which is disputed, is identical for each of the three individuals and is as follows:

> F.     Nonsolicitation. I agree that during my employment with the Company and for a period of two (2) years following a cessation of my employment, regardless of the reason for cessation, I will not for any reason, directly or indirectly, other than for or on behalf of the Company:
>
> . . . .
>
> b) Solicit, contact, service, deal or transact with any person that was a Customer of the Company at any time during the two (2) years preceding employment cessation for purposes of offering competing or similar products or services to those provided by the Company.[7]
>
> c) Encourage any person that was a Customer of the Company at any time during the two (2) years preceding employment cessation to terminate or reduce their business relationship with the Company.

Ex. 35 ¶ F.

---

[7] There is a related provision, but Securadyne does not seek to enforce it in this proceeding. It instructs Securadyne employees that they may not: "a) Solicit or encourage employees of the Company to leave and come work for me or for any company with which I am affiliated, nor will I assist others in any such efforts." Ex. 35 ¶ F(a). Securadyne's original motion also asked for an injunction against "using Securadyne's confidential information", Plaintiff's Motion for Preliminary Injunction at 1 (ECF No. 19), and Securadyne presented evidence that confidential information was given to Securadyne employees, but there was no evidence that any of the individual defendants used any such confidential information at Minuteman, and all of them and Minuteman's President denied it. The injunction therefore will not extend that broadly.

Near the beginning of the SOCA, "Customer" is defined as "any entity or person which has purchased products or services from the Company during the specified period." Ex. 35 at 1.

The SOCA also provides: "I hereby acknowledge that monetary damages would be insufficient to remedy a violation of this Agreement and I agree that, in addition to all other available remedies, any and all provisions hereof may be enforced by a court of competent jurisdiction by injunction or specific performance." Ex. 35 ¶ L.

28. Securadyne seeks to enforce the disputed provision only as follows, which amounts to a narrowing of the provision: "only as to customers with whom the Former Employees had material contacts during the two years prior to their resignation from employment with Securadyne." Pl.'s Pre-hr'g Mem. at 2 (ECF No. 68).[8] A list of those customers was admitted without objection as Exhibit 27.

29. Much of the economic value of the security integration business, and an important factor in what Securadyne paid to acquire SURV, is the likelihood of future business from existing customers. Generally, Securadyne does not have formal contracts with customers. Instead, its business is derived from long-standing relationships with customers who place purchase orders

---

[8] In their post-hearing brief, the defendants assert that "Securadyne has not defined 'material contact' and the Minuteman Defendants have no way of determining whether the customers on the list meet the unspecified definition." Post-Hr'g Mem. of the Minuteman Defs. at 36 (ECF No. 78). The defendants did not raise this issue at the hearing, did not object to the admission of the customer list (Exhibit 27) on this basis, and treated the exhibit as a list of customers with material contacts during the defendants' lawyer's cross-examination of Justin Davis. I will not consider this issue as it was raised for the first time after the evidentiary record was closed.

with Securadyne as their needs arise. A particular customer's need for new security services may go "dormant" for a time (Securadyne's President's term), then unpredictably become active again, requiring new security advice, solutions, and ultimately service. Thus, if the breach of the SOCA provision were to cause the loss of customers or of business, the loss cannot be measured by particular sales or particular orders. Moreover, the loss of customers affects the morale of Securadyne employees and damages Securadyne's reputation among the rest of its customers, in ways that cannot be measured in damages. In addition, Securadyne invested significant time and resources in training and developing its employees toward certification for various products that it sells and in customer servicing. The resulting value of this knowledge and investment cannot be measured in dollars and the SOCA provision sought to protect this knowledge and investment in the event that an employee left Securadyne.

## CONCLUSIONS OF LAW

The parties all agree that Maine law applies to the enforceability of the SOCA provision and any remedy. Under Maine law and federal cases, four factors determine whether a permanent injunction should issue: success on the merits; irreparable injury; balance of hardships; and the public interest. Joyce v. Town of Dennis, 720 F.3d 12, 25 (1st Cir. 2013) (citing Asociación de Educación Privada de P.R., Inc. v. García–Padilla, 490 F.3d 1, 8 (1st Cir. 2007)).

### 1. _The Three Individuals—Morton, Scholl and Wilder_

#### a. _Merits_

##### i. _In General_

I conclude that the employment activities of Morton, Scholl and Wilder at Minuteman breached much of one of the SOCA provisions that Securadyne seeks to enforce, namely, their agreement not to "[s]olicit, contact, service, deal or transact with any person that was a Customer of the Company at any time during the two (2) years preceding employment cessation for purposes of offering competing or similar products or services to those provided by the Company."[9] At Minutemen, technicians Morton and Scholl have regularly contracted, serviced, dealt or transacted with those who were previously Securadyne customers at those customers' places of business. At Minuteman,

---

[9] The defendants argue that the SOCA prohibition of their "contracting, servicing, dealing or transacting with" applies only to "any _person_ that was a Customer of the Company," and that elsewhere the SOCA defines "Customer" as "any _entity or person_ which has purchased products or services from the Company." Therefore, they say, Customers are either entities or persons, and those Customers who are _entities_ are not encompassed within the prohibition. That category of Customers—"entities"—constitutes most, but not all, of the Customers listed in Exhibit 27 as Customers with whom these employees had material dealings at Securadyne. Although the argument has linguistic logic, the interpretation makes no sense. First, the context of the prohibition is a limitation on what former Securadyne employees can do and on its face deals with interpersonal relations. Thus, the ordinary reading of the provision before consulting the definition language would encompass what the individual defendants have done here. Second, there was no testimony that any of the three employees understood that the clause limited their interactions only to Securadyne Customers who were individuals rather than entities, and such a limitation would make Scholl's and Green's great upset on February 8-11 over making employees sign the SOCA inexplicable. There was likewise no evidence that its drafter, Boethel, intended that meaning.

Under Maine law, the interpretation of a contract, including whether or not its terms are ambiguous, is a question of law. Levine v. KeyBank Nat'l Ass'n, 861 A.2d 678, 686 (Me. 2004). If the language is ambiguous, its interpretation is a question of fact. Acadia Ins. Co. v. Buck Constr. Co., 756 A.2d 515, 517 (Me. 2000). I conclude that the defendants' argument fails on both counts. First, the language of the covenant as written is not ambiguous to an ordinary non-lawyer reader. Second, if it is ambiguous because of the earlier definition, the evidence presented at trial supports the interpretation that I have given it. It was clear from the testimony that the individual defendants understood the SOCA provision to prevent them from doing business for 2 years with Customers—whether persons or entities—with which they had done business while employed by Securadyne.

Office Operations Manager Wilder has dealt or transacted with them by telephone when they called for service. But I also find that there is no evidence that Morton, Scholl or Wilder *solicited* Securadyne customers for Minuteman or that they breached the other SOCA provision in question, requiring that they not "[e]ncourage any person that was a Customer of the Company at any time during the two (2) years preceding employment cessation to terminate or reduce their business relationship with the Company."

### ii. *Enforceability*

Under Maine cases, an employer can choose to narrow the scope of such a provision in seeking its enforcement and then a court must judge enforceability according to the narrowed provision—"only as [the employer] has sought to apply it and not as it might have been enforced on its terms." Brignull v. Albert, 666 A.2d 82, 84 (Me. 1995); Chapman & Drake v. Harrington, 545 A.2d 645, 647 (Me. 1988). Moreover, "[t]he reasonableness of a noncompetition covenant is a question of law that must be determined by the facts developed in each case as to its duration, geographic area, and the interests sought to be protected." Brignull, 666 A.2d at 84. Under Maine law, "[e]mployment itself has been held to be a consideration for a noncompetition covenant in an employment contract." Id.

The clause as Securadyne has narrowed it ("only as to customers with whom the Former Employees had material contacts during the two years prior

to their resignation from employment with Securadyne"[10]) is not unconscionable or unreasonable under the Maine precedents. According to Maine's Law Court, "[a] covenant not to compete[11] may be reasonable . . . when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." Chapman & Drake, 545 A.2d at 647. That description applies to Morton, Scholl and Wilder and the interests that Securadyne seeks to protect by means of this SOCA clause.

This covenant is limited in time to two years, well within the permitted time limits. See, e.g., Everett J. Prescott Inc. v. Ross, 383 F. Supp. 2d 180, 191 (D. Me. 2005) (three years reasonable); Brignull, 666 A.2d at 83 (four years); Chapman & Drake, 545 A.2d at 646 & 648 (five years permissible for prohibition of soliciting or accepting business from former customers).

This covenant is limited in scope. Although it does not refer to geography, Securadyne/SURV's customers were mostly located in Maine, and Securadyne seeks to enforce the clause only with respect to customers with whom the individual defendants had material contacts at Securadyne during the two years before their resignation. Chapman & Drake found that the absence of geographic limits was not unreasonable where the clause was

---

[10] As part of its narrowing, Securadyne also agreed that any injunctive relief against Wilder can be limited to the customers with whom Morton and Scholl had material contact because although Wilder's material contacts extended across Securadyne's customer base, it is those with whom the three employees collectively interacted that give Securadyne the most concern.

[11] I rely on Maine's non-compete cases although, as I describe later, the covenant here is not really a non-compete provision, but narrower.

limited to soliciting or accepting business from former customers, because that limitation still permitted the employee to choose his employment location. 545 A.2d at 648. That is the nature of the limitation here.

Moreover, this SOCA provision is not a blanket non-compete agreement; it does not unreasonably limit these employees' employment opportunities. Morton and Scholl can use their technical expertise for Minuteman customers other than those they served at Securadyne and in locations other than Maine. Wilder is more limited at Minuteman since it seems unlikely that there is an effective way to exclude her from phone calls from Minuteman customers who previously were customers of Securadyne.[12] But her employment skills are not in the technical area of security, but rather as office operations manager and service dispatcher, skills that she can use in many other businesses.

### iii. _Misrepresentation_

I conclude that no misrepresentation prevents enforcement of the SOCA provision that I have found the employees breached. First, Davis's email statement that the SOCA is not a noncompetition agreement is not a misrepresentation for the reasons I have just described; the clause limits their activity only as to particular customers. It is apparent that Branch Manager Green understood what the agreement signified—he testified that he warned Davis on Friday February 8 that the SOCA would provoke a huge outcry.

---

[12] Securadyne's lawyer suggested in her closing argument that if Minuteman has technicians other than Morton and Scholl to service customers who used to be Securadyne customers, they will be out of Minuteman's Andover Massachusetts office (Minuteman has no other technicians in Maine) and those customers could be instructed to call the Andover office, thereby avoiding Wilder.

Likewise, the testimony of Wilder, Green and Scholl about Scholl's reaction on being presented the agreement demonstrates that Scholl understood what it signified. No evidence was presented that Morton and Wilder did not understand its significance. For the same reasons, I conclude that Morton, Scholl and Wilder were not misled by Davis's email description of the SOCA as "almost identical" to the SURV nondisclosure agreement that they had signed previously (in fact, Wilder never signed such a document) or that it was an "update" of the SURV nondisclosure agreement. Ex. 14. Those were adequate cover-letter descriptions of a document that they were permitted to read before they in fact signed it.

### iv. *Duress*

Economic duress does not make the breached SOCA provision unenforceable. Maine has not yet adopted the doctrine of economic duress as a bar to contract enforcement. Everett J. Prescott, Inc., 383 F. Supp. 2d at 189 (citing City of Portland v. Gemini Concerts, Inc., 481 A.2d 180, 183 (Me. 1984)). Nevertheless, this court has approached such an argument on the basis that if Maine were to "adopt the doctrine," it would "resemble the doctrine as it has developed in other states within this Circuit," Everett J. Prescott, Inc., 383 F. Supp. 2d at 189 (Woodcock, J.), and that "[a]ctions 'that are not wrongful cannot result in duress.' There can be no rescission merely upon the grounds of 'driving a hard bargain.'" Id. (quoting City of Portland v. Gemini Concerts, Inc., 481 A.2d 180, 183 (Me. 1984)). The "duress" here was the promised loss of employment at Securadyne for those employees who refused to sign the

SOCA.  But Securadyne employees were employees at will.  Thus, conditioning their employment on executing the agreement was not wrongful and, therefore, not improper duress.  Moreover, making an individual's bonus payment conditional on signing the SOCA was not economic duress since the bonus, like the at will employment itself, was entirely discretionary.  And the duress caused by withholding or delaying the bonus, an amount minor in comparison to the respective employee's salary, was insignificant.  I also conclude that it is unreasonable to read Davis's email language as a threat to forfeit everyone's bonus if a single person failed to sign the SOCA.  Finally, even if there were improper duress, these three employees continued to work from February until September thereafter, without challenging the enforceability of the SOCA, thereby acquiescing to the covenant.  See Veilleux v. Fulmer, 2000 WL 898451 at *1 (D. Me. 2000) (Kravchuk, M.J.) (not deciding whether Maine or Florida law was applicable) ("Plaintiff's silence during the more than four year period prior to his claim of duress amounted to ratification of the 1994 agreement as a matter of law."); Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 24 (1st Cir. 1993) (under New Hampshire law, duress defense waived where allegedly coerced individuals waited several months to assert duress and accepted benefits under the agreement); In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989) (federal law) ("A party may ratify an agreement entered into under duress in a number of different ways: first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to

avoid it; and third, by recognizing its validity . . . by acting upon it, performing under it, or by affirmatively acknowledging it." (citation and quotation marks omitted)). <u>See also</u> <u>Knowlton v. Ross</u>, 95 A. 281, 283 (Me. 1915) ("If a person, having been constrained by duress to do any act, afterward voluntarily acts upon it, or in any way affirms its validity, he precludes himself from then avoiding it."); <u>Williams v. Noyes & Nutter Mfg. Co.</u>, 92 A. 482, 484 (Me. 1914) ("The bankrupt elected to make a mortgage, and for about three years thereafter carried on his business with the mortgage on his stock. The time involved negatives the claim of fraud or duress, and serves as a waiver of any right to now set up either claim."). I conclude that the provision therefore is enforceable.[13]

### b.   *Irreparable Injury*

An action for damages is not adequate to capture the injury to Securadyne that breach of this SOCA provision causes. I have outlined in my Findings of Fact the elements of loss that cannot be captured in a damage remedy. This court has stated that "customer good will" is "an immeasurable quantity which, once lost, may be difficult to reestablish." <u>Officemax Incorporated v. County Qwik Print Inc.</u>, 751 F. Supp. 2d 221, 248 (D. Me. 2011) (Woodcock, J.), <u>reversed on other grounds</u>, <u>OfficeMax, Inc. v. Levesque</u>, 658 F.3d 94 (1st Cir. 2011), and that "[a] business's interests in good will, customer contacts, and referral sources 'cannot be measured in numerical or

---

[13] This ratification also disposes of any arguments the individuals have over the length of time they had to review the SOCA before signing it and whether they had an opportunity to consult a lawyer.

monetary terms, and neither can the damages to these interests that [the employer] will suffer without injunctive relief.' Further, it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" Everett J. Prescott, 383 F. Supp. 2d at 192 (Woodcock, J.) (citations omitted).

### c. *Balance of Hardships*

Morton and Scholl are not foreclosed from using their skills in Maine or in the industry that they have chosen. In other words, they have other opportunities both at Minuteman and at other security integrators. Moreover, the limitation on their interactions with Securadyne customers is reasonably limited in time and scope. Wilder may be more limited in her ability to serve as Office Operations Manager at Minuteman[14] or in obtaining employment in the security industry until September 2015 by virtue of the limitation, but she can use her administrative and human relations skills in many other fields. For its part, Securadyne stands to lose significant business in Maine if these individuals are permitted to continue and nurture their previous relationships with Securadyne customers by servicing and interacting with them on behalf of Minuteman, and the detrimental consequences threaten to cascade. I understand from Morton's and Scholl's testimony that they consider some of the customers to be theirs rather than Securadyne's because they had serviced those customers at previous employers. But there is no evidence that the

---

[14] But see footnote 12 supra.

customers ever "belonged" to the individual as opposed to the company for which he worked, and no evidence that Morton or Scholl ever sought to exclude previous customers from the scope of the SOCA. Moreover, Securadyne/SURV made its own investment in the relationships with those customers during the period that it employed Morton and Scholl.[15]

### d. *Public Interest*

The Maine Law Court has accounted for any public interest in its decisions identifying, on public policy grounds, what type of covenant can be enforced and what cannot:

> We have long recognized that non-competition agreements are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue. While a proprietor of a business may obtain enforcement of a non-competition agreement to prevent a former employee from soliciting old customers, a former employee may not, absent unusual circumstances, be prevented from entering into the practice of a business that requires no specialized training and does not rely on unique business methods or trade secrets acquired while serving the former employer.

Lord v. Lord, 454 A.2d 830, 834 (Me. 1983) (internal citations omitted). For the reasons given above, I have concluded that under Maine law the breached provision here is enforceable under Maine's public policy standards. There is no other public interest that counsels against granting injunctive relief.

---

[15] The defendants introduced some evidence to suggest that Securadyne itself has been responsible for losing some of its customers to Minuteman. That may bear upon a damage recovery, but does not alter my conclusion that injunctive relief is appropriate. The defendants also argued that Securadyne should be denied the injunction on the equitable basis of "unclean hands" because its predecessor SURV acquired customers of other competitors when Morton and Scholl came to SURV. There is no evidence that SURV was complicit in any previous breach of covenant that Morton and Scholl may have committed.

## 2. *The Defendant Minuteman*

Securadyne has not supplied evidence to support its theory in the Complaint that Minuteman committed the tort of tortious interference with an advantageous business relationship[16] or engaged in civil conspiracy.[17] I conclude therefore that Securadyne is not entitled to injunctive relief against Minuteman. Securadyne asks me nevertheless to enjoin Minuteman from acting "in concert with" the individual defendants. That prohibition may be a legal consequence of my injunction against the three individuals (Fed. R. Civ. P. 65 (d)(2)(C) states than an injunction binds "other persons who are in active concert or participation with" the parties when they have notice, see Pearl Investments, LLC v. Standard I/O, Inc., 297 F. Supp.2d 335, 338 (D. Me. 2004)), but I see no reason to include Minuteman in the injunction.

### CONCLUSION

For all these reasons, I conclude that Securadyne has satisfied the permanent injunction requirements as to the three individual defendants. I **DENY** the defendants' request for a declaratory judgment declaring the SOCA provision in question unenforceable, and **GRANT** the plaintiff's request for a permanent injunction prohibiting Morton, Scholl and Wilder from contacting, servicing, dealing or transacting—for purposes of offering competing or similar products or services to those provided by Securadyne—with any customer with

---

[16] Under Maine law, tortious interference with prospective economic advantage requires a plaintiff to prove among other things that the defendant interfered through fraud or intimidation. Rutland v. Mullen, 798 A.2d 1104 (Me. 2002).

[17] Under Maine law, civil conspiracy is not an independent tort but requires some independently recognized tort. Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell, 708 A.2d 283, 286 (Me. 1998).

whom they had material contacts during the two years before they resigned from Securadyne employment. Such customers are listed in Exhibit 27 admitted at the hearing.

The plaintiff shall propose a judgment accordingly that complies with Fed. R. Civ. P. 65(d), and submit it to the defendants for review as to form and file it with the Clerk by April 18, 2014.

Thereafter, the Magistrate Judge shall convene a scheduling conference as his calendar permits to determine how the remainder of the case shall proceed.

**SO ORDERED.**

**DATED THIS 2ND DAY OF APRIL, 2014**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**